## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


**AUDREY V. MILLER,**

        **Plaintiff,**

**v.**                             **Civil Action No. 1:12cv98**
                                         **(Judge Keeley)**


**SFF HAZELTON,**
**WARDEN JAMES CROSS,**
**ADMINISTRATOR SUSAN FOLK,**
**UNIT MGR LeMASTERS,**
**COUNSELOR CHRISTMAS,**
**LT. BERRIOS,**
**MR. A. PALIOTHEODOROS,**


        **Defendants.**


## REPORT AND RECOMMENDATION

On June 12, 2012, *pro se* Plaintiff, Audrey Miller, initiated this case by filing a civil rights complaint against the above-named Defendants in the United States District Court for the Northern District of Texas. Because the events giving rise to the complaint occurred at the Secure Female Facility ("SFF") at Hazelton, which is located in Bruceton Mills, West Virginia, the case was transferred to this Court on June 15, 2012. On that same date, Plaintiff was sent a Notice of Deficient Pleading. On July 9, 2012, Plaintiff filed her complaint on this Court's approved form. On July 16, 2012, an Order was entered granting Plaintiff leave to proceed without prepayment of fees. On July 30, 2012, Plaintiff paid the required initial partial filing fee. On November 14, 2012, Plaintiff was directed to provide proof that she had exhausted her administrative remedies by resubmitting her BP-11 in proper form and receiving a rejection. On February 11, 2013, Plaintiff

responded with a letter indicating that the grievance packets at SFF Hazelton were defective. On May 8, 2013, former Magistrate Judge David Joel entered a Report and Recommendation that this matter be dismissed as untimely and for failure to exhaust administrative remedies. On May 28, 2013, Plaintiff filed objections. On June 6, 2013, the Court declined to adopt the Report and Recommendation. On June 10, 2013, an Order to Answer was entered. On June 11, 2013, summonses were issued. On September 3, 2013, Defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment. On September 4, 2013, a <u>Roseboro</u> Notice was issued. On September 30, 2013, Plaintiff filed a Response. On May 12, 2014, an Order to Clarify Claim was filed.[1] On May 30, 2014, Plaintiff responded[2] and on June 5, 2014, an Order was entered directing Plaintiff to file a Federal Tort Claim on this Court's form complaint. On June 20, 2014, Plaintiff filed her FTCA form complaint and on July 2, 2014, Defendants filed a Motion to Withdraw their Motion to Dismiss so that they might address Plaintiff's <u>Bivens</u> claim and FTCA claims simultaneously. On August 26, 2014, Defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment addressing Plaintiff's <u>Bivens</u> complaint and FTCA complaint. A <u>Roseboro</u> Notice was issued on August 27, 2014, and on September 25, 2014, Plaintiff filed a memorandum in opposition to Defendants' alternative motions.

## I.  <u>Factual History</u>

On July 21, 1995, Plaintiff was sentenced in the United States District Court for the District

---

[1]In reviewing this matter, the undersigned concluded that although Plaintiff had never named the United States as a defendant and had never filed a complaint under the Federal Tort Claim Act, she filed an administrative tort claim on May 20, 2011, seeking compensation in the amount of $150,000.00, the amount she was seeking in her <u>Bivens</u> complaint. Therefore, it was unclear whether Plaintiff intended to file a <u>Bivens</u> complaint, a FTCA, or both.

[2]Plaintiff noted that it was her intent to file both a civil rights complaint against the named defendants and a FTCA against the United States. (Doc. 70).

of Delaware for a violation of 21 U.S.C. § 841(A)(1), "Distribution of Cocaine," to a term of 300 months imprisonment to be followed by five years of supervised release. (Doc. 80-2, pp. 2-3).Plaintiff was designated to the Secure Female Facility at Hazelton from December 7, 2006, until September 7, 2010. (Doc. 80-2, p. 9). Plaintiff was released from the custody of the BOP on May 24, 2013, via good conduct time. (Doc. 80-2, p. 7).

On March 21, 2010, VICON camera footage showed another inmate exiting Plaintiff's cell at SFF Hazelton. A short time later, Plaintiff exited her cell and fell to the floor. Both inmates were medically assessed. Plaintiff sustained contusions and abrasions to the left side of her head and facial area and displayed nasal swelling. The other inmate suffered injuries to the fourth digit of her left hand. (Doc. 80-2, p. 10).

Originally, the other inmate was charged with assaulting Plaintiff. However, after reviewing the incident report, Plaintiff's unit manager, David LeMasters, determined that the facts alleged more appropriately supported the Code 201 prohibited offense of "Fighting." As a result, Mr. LeMasters sent the first incident report back to Special Investigative Services ("SIS") to be revised. (Doc. 80-5, p. 2)

A Disciplinary Hearing Officer ("DHO") conducted a hearing on May 14, 2010. Recreation Specialist Connor appeared at the hearing as Plaintiff's staff representative. (Doc. 80-2, p. 12). Following the hearing, the DHO found that Plaintiff had committed the act as charged. On May 24, 2010, the DHO issued her decision which found Plaintiff had committed the act of fighting and sanctioned Plaintiff by disallowing 27 days Good Conduct Time, imposing 30 days of disciplinary segregation, 90 days loss of commissary privileges and 90 days loss of telephone privileges. In addition, the DHO recommended a disciplinary transfer. (Doc. 80-2, p. 14). Plaintiff was transferred

on September 7, 2010, and following routing through the Oklahoma Transfer Center, was designated to FCI Danbury which is located in Connecticut. (Doc. 80-4, p. 4).

## II.    Contentions of the Parties

### A.    *Plaintiff's Complaint*

In her <u>Bivens</u> complaint, Plaintiff alleges that SIS Lt. Berrios had ordered that she and K.R. never be housed together. Plaintiff further alleges that there was a separation order in place.  Plaintiff maintains that Warden Cross was made aware of the situation but failed to investigate.  Plaintiff also alleges that she was placed in harm's way when K.R. was transferred back to her housing unit. She further alleges that the various defendants showed favoritism towards K.R., which  superceded proper procedure and the rules and regulations associated with the assessment of the incident that occurred on March 21, 2010. For  relief, Plaintiff seeks $150,000.00.

In her FTCA complaint, Plaintiff alleges that Warden Cross, SFF Administrator Susan Folk, Unit Manager LeMasters, Counselor Christmas, Special Investigative Services Lt. Berrias and Lt. Paliotheodoros were negligent in their duties to insure the safety of their charges and were culpable in the cover up of the events that happened to her. For relief, she seeks $150,000.00.

### B.    *Defendants' Motion to Dismiss or for Summary Judgment*

In support of their Motion, Defendants raise the following arguments:

1.    Plaintiff failed to fully exhaust her administrative remedies with respect to the claims against the <u>Bivens</u> defendants;

2.    Plaintiff's claims against the individual defendants should be dismissed due to lack of personal involvement;

3.    Plaintiff's claims against the individual defendants should be dismissed for failure to state a claim upon which relief can be granted;

4.    Plaintiff's claims against the individual defendants should be dismissed

because Defendants are entitled to qualified immunity;

5. Claims against the individual defendants in their official capacities must be dismissed;

6. The United States is entitled to sovereign immunity with respect to any claim arising out of the March 21, 2010, incident; and

7. Plaintiff has no protected liberty interest in designation to a particular institution.

(Docket No. 80).

## C. *Plaintiff's Response*

In her response, Plaintiff alleges that there are material facts in dispute as to whether Defendants knew or should have known that a substantial threat to her safety existed prior to March 21, 2010. More specifically, Plaintiff alleges that on or about March 6, 2009, K.R. attacked her and as a result K.R. was placed in a Special Housing Unit with a directive being issued by or to Defendants to keep them separated. However, notwithstanding the previous attack and directive, Defendants moved inmate K.R. into the same housing unit with her and shortly thereafter K.R. violated institutional rules by going into her cell, attacking her and causing serious bodily injuries. Plaintiff also asserts that she did exhaust all institutional administrative remedies.

## III. Standards of Review

## A. *Motion to Dismiss*

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to plaintiff. Mylan Labs., Inc.

v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that Plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46.  In Twombly, the Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable," id.  Therefore, in order for a complaint to survive dismissal for failure to state a claim, Plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)).  In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court, which has held that a "claim has factual plausibility when Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim.  Id.

## B.    *Motion for Summary Judgment*

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Motions for summary judgment impose a difficult standard on the moving party because it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). In applying the standard for summary judgment, a court must review all evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . .must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587 (citation omitted).

## III. Analysis

### A. FTCA

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680. Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 2674 & 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001). In West Virginia, in every action for damages resulting from injuries to a plaintiff alleged to have been inflicted by the negligence of the defendant, a plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). The burden is on plaintiff to prove these elements by a

preponderance of the evidence. Id. at 899; see also Murray v. United States, 215 F.3d 460, 463 (4th Cir. 2000). Therefore, plaintiff must prove that the "defendant's breach of duty was more likely than not the cause of the injury." Murray at 463 (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991); see also Strahin v. Cleavenger, 603 S.E.2d 197 (W.Va. 2004)(stating that "no action for negligence will lie without a duty broken.").

The FTCA includes specific enumerated exceptions in 28 U.S.C. §2680. If an exception applies, the United States may not be sued and litigation based upon an exempt claim is at an end. Smith v. United States, 507 U.S. 197 (1993); Dalehite, *supra*. Among the exceptions to the FTCA most frequently applied is the "discretionary function." The discretionary function exception precludes governmental liability for "[a]ny claim based upon ... the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Congress believed that imposing liability on the government for its employees' discretionary acts "would seriously handicap efficient governmental operations." Id. at 814 (internal citations and quotations omitted).

The United States Supreme Court has announced a two-step test for determining whether the discretionary function exception bars suit against the United States in a given case. First, the Court must consider the nature of the conduct and determine whether it involves "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991). Government conduct does not

involve an element of judgment or choice and is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." Id. at 322 (internal citations and quotations omitted). If the conduct in question involves the exercise of judgment or choice, the second step of the analysis is to determine whether that judgment is grounded in considerations of public policy. "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 323.

With respect to federal prisoners, the Supreme Court has determined that the duty of care owed by the BOP is fixed by 18 U.S.C. §4042, independent of an inconsistent state rule. United States v. Munitz, 280 F. Supp. 542, 546 (S.D.N.Y 1968). Title 18 U.S.C. §4042 defines the duty of care owed to a prisoner as "the exercise of ordinary diligence to keep prisoners safe and free from harm." Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). However, the BOP's duty towards the protection of prisoners is not the guarantee of "a risk-free environment." See Usher v. United States, 2010 WL 3721385 (E.D. Ky. Sept. 15, 2010).

In West Virginia, negligence is "always determined by assessing whether the actor exercised 'reasonable care' under the facts and circumstance of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances." Strahin v. Cleavenger, 603 S.E.2d 197, 205 (W.Va. 2004). "A long standing premise of the law of [West Virginia] is that negligence is the violation of the duty of care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place, manner, or person." Setser v. Browning, 590 S.E.2d 697, 701 (W.Va. 2003). Accordingly, the duty of care owed to an inmate under West Virginia

law is consistent with 18 U.S.C. §4042.

Although 18 U.S.C. §4042 sets forth the mandatory duty of care, it does not direct how the duty is fulfilled. See Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997)(finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while fulfilling their duty to protect inmates."). However, under the FTCA, in disputes between prisoners, it is clear that BOP employees could be negligent in their duty to protect prisoners if they "knew or reasonably should have known of a potential problem" between inmates. Parrott v. United States, 536 F.3d 629, 637 (7th Cir. 2008).

As previously noted, Plaintiff alleges that on or about March 6, 2009, while housed in Unit-J, she was attacked by K.R. Plaintiff further alleges that Susan Folk recognized that inmate K.R. posed a substantial threat to her safety and issued a separation order, "or the like," segregating K.R. in a Special Housing Unit. Plaintiff further alleges that the "separation order" report is customarily sent to the other individual Defendants for investigation, evaluation and action in accordance with institution policy to ensure inmate, staff and institutional safety. Therefore, Plaintiff alleges that all individual Defendants were duly informed pursuant to institution policy on or about March 6, 2009, that K.R. was a real and substantial threat to her safety. Plaintiff alleges that despite this knowledge, Defendants placed K.R. in the same housing unit as she was in, which resulted in the incident on March 21, 2010. Based on this alleged negligence, Plaintiff seeks compensation from the United States.

The record before this Court does not support Plaintiff's allegations. Each of the individual Defendants has submitted a Declaration that he or she had no prior knowledge that K.R. posed any threat to Plaintiff. Of special significance is the Declaration of Susan Folk, who was the

Administrator at SFF Hazelton during the time period pertaining to Plaintiff's complaint. In her Declaration, Folk notes:

> In March 2009, Plaintiff approached me requesting a transfer to a different dorm from this particular inmate. Plaintiff did not state that she was in fear of this inmate. Rather, Plaintiff told me that she had been in a relationship with that inmate (which is strictly prohibited by Bureau policy), but the relationship had ended. Plaintiff informed me that she and the inmate were no longer comfortable residing in the same living area. At this particular time, plaintiff was assigned to Cell 224 on Range 14 in the J Unit.... The other inmate was also assigned to the J Unit, Range 14, but resided in Cell 223... I asked Plaintiff if she felt that she and the inmate would have problems residing in the same facility even after a change in housing assignment. Plaintiff assured me that she did not believe they would have future problems. I specifically inquired as to whether Plaintiff felt a transfer to another institution was warranted and she answered in the negative. Therefore, I changed Plaintiff's housing assignment and on March 13, 2009, Plaintiff was moved to the K Unit, Range 13, Cell 117.... There were no problems, to my knowledge, between Plaintiff and the inmate before or after this move. I did not initiate a transfer or an investigation as to whether the two inmates should have separatee status because there was no indication that a change in housing assignment would be inadequate to prevent any further discomfort. The decision to initiate an investigation would have been in the discretion of the staff at the SFF. If there had been facts to indicate that Plaintiff and the other inmate could not safely reside on the compound together, I would have referred the information for a possible investigation. On September 8, 2009, the other inmate began participating in a residential program that required her to reside in the K Unit. She was assigned first to Range 11, Cell 124, and then later to Range 13, Cell 124... At this time, Plaintiff was assigned to [the K Unit] Range 14, Cell 202[3]... To my knowledge, Plaintiff and the other inmate co-existed peacefully during the time they were assigned to the same unit. They had many friends in common and I observed them interacting in a friendly manner during this time. The first time I was aware of a problem between them was the altercation on March 21, 2010.

---

[3]According to Plaintiff's Inmate History, except for two days in the SHU, she had been on the K range since March 13, 2009. (Doc. 80-9, p. 3).

(Doc. 80-8, pp. 2-4).

The salient point guiding this Court's review is the fact that Plaintiff bears the burden of proving that an equivocal waiver of sovereign immunity exists and demonstrating that the discretionary function exception does not apply. LeRose v. United States, 285 F. App'x 93, 96 (4th Cir. 2008); Welch v. United States, 409 Fed 3rd 646 (4th Cir. 2005). Given the Declarations of the individual Defendants, and in particular that of Folk, it is clear that Defendants had no prior knowledge that K.R. posed a threat to Plaintiff's safety and Plaintiff has failed to carry her burden to demonstrate that the discretionary function does not apply.

Furthermore, it is pertinent to note that when a federal prisoner sues under the FTCA for injuries caused by a fellow inmate, this Court and others have uniformly held the action to be barred by the discretionary function exception. See, e.g., Rich v. United States, 2014 WL 2778652 N.D.W.Va. 2014)(dismissing FTCA complaint alleging negligent failure to protect plaintiff from attack by prison inmates); Usry v. United States, 2013 WL 1196650 (N.D. W.Va. 2013) aff'd. Usry v. United States, 545 Fed. Appx. 265 (4th Cir. 2013)(upholding dismissal of FTCA complaint alleging negligent failure to protect plaintiff from an attack with a metal pipe by another prison inmate); Little v. United States of America, 5:11cv41-FPS-JSK N.D.W.Va. Aug. 8, 2014)(dismissing plaintiff's FTCA alleging negligence on the part of BOP in protecting him from attack with metal weapon by fellow inmates); Donaldson v. United States, 281 Fed. App'x. 75, 76-78 (3rd Cir. 2008)(upholding dismissal of a FTCA claim that federal prison employees failed to protect plaintiff from assault by a fellow prisoner on a finding that the claim was barred by the discretionary function exception); Alfrey v. United States, 276 F.3d 557, 565 (9th Cir. 2002); Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998)(reversing judgment in favor of prisoner who brought an FTCA action for injuries sustained as the result of an attack by another inmate); Dykstra v. United States Bureau of Prisons, 140 F.3d 791 (8th Cir. 1998)(discretionary function

exception applied, barring suit for BOP officials' failure to warn plaintiff that his youthful appearance might make him vulnerable to attack, or to place him in protective custody when plaintiff complained that fellow inmate was staring at him); Calderon v. United States, 123 F.3d 947 (7th Cir. 1997 (discretionary function exception applied to FTCA claim for government's failure to protect plaintiff from attack by cellmate); Buchanan v. United States, 915 F.2d 969 (5th Cir. 1990) (discretionary function exception applied to FTCA claim for damages by prisoners held hostage during a prison uprising); and Graham v. United States, 2002 U.S. Dist. LEXIS 1765 (E.D. Pa. Feb. 5, 2002).

In conclusion, Plaintiff's claims of negligence against the individual Defendants for not placing or enforcing a separatee order[4] with respect to K.R., involved "an element of judgment or choice." Gaubert, supra at 322. Federal courts have consistently held that because §4042(a) does not mandate a specific, non-discretionary course of conduct, a plaintiff must either demonstrate that other mandatory directives were violated or that a BOP employee made a discretionary judgment not grounded in the policy of the regulatory regime in order to establish subject matter jurisdiction. See, e.g., Calderon, 123 F.3d at 950 (holding that like §4042(a), the regulations within 28 C.F.R. §541 regarding inmate discipline and special housing units also provide general guidance to BOP employees). Here, Plaintiff has pointed to no mandatory directive that was violated and the actions by the SFF Hazelton officials involved an element of judgment or choice. Therefore, the inquiry then becomes whether the challenged action was based on considerations of public policy." Id. "Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors. These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy." Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998). Because §4042(a) is an "established governmental policy . . . [that] allows a Government agent to exercise discretion" in

---

[4]Defendants all deny that there was a separatee order in place.

providing for the safekeeping, protection and care of inmates, it must be "presumed that the [BOP's] acts are grounded in policy when exercising that discretion." <u>Gaubert</u>, *supra* at 324.

While the undersigned finds that the injuries sustained by Plaintiff were unfortunate, Plaintiff has failed to rebut that presumption. Thus, the undersigned finds that this Court lacks subject matter jurisdiction to consider her claim.

## A. <u>Bivens</u>

For purposes of explanation, a plaintiff seeking relief against a federal official for injury has two separate and distinct claims for relief. She may file a common law tort claim against the United States under the FTCA and, or in the alternative, she may file a constitutional tort claim against the individual officials under <u>Bivens</u>. The two claims are separate causes of action with different standards of proof and there are advantages and disadvantages to each. The defendant in a FTCA action is the United States. However, in a <u>Bivens</u> suit, the defendant is the individual official. <u>See</u> 28 U.S.C. §§ 1346(b) & 2674. Therefore, payment of a successful FTCA claim is paid by the United States Treasury; while a successful judgment against an individual may not be satisfied if the defendant lacks sufficient assets. In addition, while a jury trial is available in a <u>Bivens</u> action, only a bench trial is permitted under the FTCA. 28 U.S.C. § 2402. Furthermore, punitive damages are available in a <u>Bivens</u> action but are not available under the FTCA. <u>Id.</u> § 2674. Finally, and most importantly, a judgment under the FTCA constitutes "a complete bar to any action by the plaintiff, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676. This is true whether the FTCA claim is brought before or after the <u>Bivens</u> claim or if both claims are brought in the same suit. Likewise, this is also true whether the FTCA judgment is favorable to the plaintiff or the United States. *Compare* <u>Unus v. Kane</u>, 565 F.3d 103, 121-22 (4th Cir. 2009)(same suit, FTCA judgment for the United States), with <u>Rodriquez v. Handy</u>, 873 F.2d 814, 816 (5th Cir. 1989)(same suit, FTCA judgment for

plaintiffs); *compare also* <u>Farmer v. Perill</u>, 275 F.3d 958, 959 (10th Cir. 2001)(different suits, FTCA judgment for the United States) with <u>Moon v. Pace</u>, 213 F.2d796 (5th Cir. 1954)(different suits, FTCA judgment for plaintiff).

Accordingly, in light of the undersigned's recommendation that the FTCA be dismissed with prejudice, it would appear that Plaintiff's <u>Bivens</u>' complaint likewise should be dismissed with prejudice. Furthermore, in the event that the Court should decline to adopt the undersigned's recommendation that the FTCA claim be dismissed with prejudice, Plaintiff's <u>Bivens</u> complaint should still be dismissed.

**<u>Exhaustion of Administrative Remedies</u>**

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). A <u>Bivens</u> action, like an action under 42 U.S.C. § 1983, is subject to the exhaustion of administrative remedies. <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[5] and is required even when the relief sought is not available. <u>Booth</u> at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. <u>See</u> <u>Porter</u>, at 524 (citing <u>Booth</u>, 532 U.S. at 741) (emphasis added).

Moreover, in <u>Woodford v. Ngo</u>, 548 U.S. 81, 84-85 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a

---

[5] *Id.*

federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford at 92-94 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. *Id.* at 101-102.

The Bureau of Prisons provides a four-step administrative process beginning with attempted informal resolution with prison staff (BP-8). See 28 C.F.R. § 542.10, et seq. If the prisoner achieves no satisfaction informally, she must file a written complaint to the warden (BP-9), within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the warden's response, she may appeal to the regional director of the BOP (BP-10) within 20 days of the warden's response. Finally, if the prisoner has received no satisfaction, she may appeal to the Office of General Counsel (BP-11) within 30 days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until she has filed her complaint at all levels. 28 C.F.R.§ 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

In support of their Motion to Dismiss or for Summary Judgment, Defendants contend that Plaintiff submitted just one administrative remedy (Administrative Remedy 596259) that could arguably relate to the claims raised in this action. However, Defendants argue that Plaintiff failed to exhaust administrative remedies with respect to her Bivens claims against the individual defendants for at least three reasons. First, she submitted Remedy 596259 at the institutional level on June 24, 2010. Accordingly, Defendants argue that even if one assumes *arguendo*, that the purpose of that remedy was to redress wrongs related to the alleged assault, she commenced the remedy more than 20 calendar days following the incident. Secondly, they argue that she failed to complete the appeal at the General Counsel level. While she submitted papers to the General Counsel's office, they noted

that she did not do so properly and the appeal was rejected and returned to her. Specifically, BOP Central Office explained the reasons for rejecting the appeal and afforded Plaintiff 15 days to correct the deficiencies and resubmit, which she did not. Finally, Defendants argue that Remedy request 596259 was intended to rectify Plaintiff's transfer from SFF Hazelton to another facility for allegedly unfair and improper reasons. Defendants contend that Plaintiff did not submit an administrative remedy in which she claimed that the individual defendants knew of a threat and failed to protect her.

Plaintiff filed her BP-9 (Remedy 596259-F1) at the institutional level on June 24, 2010, and it was received by the administrative remedy clerk on June 25, 2010. (Doc. 12-1, p. 3). Accordingly, the remedy was received more than twenty (20) days after the March 20, 2010, incident and more than 20 days after the May 24, 2010, DHO decision to recommend a disciplinary transfer. However, the remedy was not rejected as untimely, and accordingly, it would appear improper for this Court to impose the time restraints set forth by the BOP grievance process, if the same was not enforced by the BOP itself.

In addition, Defendants argue that Plaintiff's BP-11 (Remedy 596259-A1) was rejected on November 9, 2010. In the remarks, staff noted that "[a]ll four pages of the BP 11 must contain wording. Consider writing on each page with the same wording." (Doc. 12-1, p. 14). Plaintiff was afforded 15 days of the date of the rejection notice within which to resubmit her appeal in proper format. (Id.). There is no dispute that she did not resubmit her appeal. However, Plaintiff alleges that there was a problem with the administrative remedy packets available to her. Because of this alleged defect, Plaintiff maintains that she was unable to send them a packet with all four (4) pages. She further alleges that the Central Office was made aware of the defect and disregarded the same. Finally, Plaintiff maintains that in an effort to remain timely, she proceeded on. (Doc. 30, p. 1). In fact, it would appear that when Plaintiff submitted her BP-11, she added a cover sheet that stated: [p]lease

18

be advised that the 3rd sheet of these packets are defected [sic]. The carbon is not translating [sic] through. A fourth copy is added. See attached." (Doc. 30, p.2). BP-10). Accordingly, the undersigned is of the opinion that Plaintiff was prevented from exhausting her administrative remedies and it would be improper to dismiss her complaint based on a technicality that appears to have resulted through no fault of Plaintiff.

However, the undersigned is of the opinion that the grievance raised in Remedy 596259 did not relate to Plaintiff's pending complaint that staff failed to protect her from as assault by K.R., but instead relates to her own disciplinary action and transfer from SFF Hazelton. In reaching this conclusion, the undersigned has carefully reviewed the grievances filed by Plaintiff under Remedy 596259. In her BP-9, dated June 24, 2010, Plaintiff stated:

> On March 21, 2010 I was attacked and beaten unconscious, bloody, black and blue with a broom in my cell by inmate [K.R.] [K.R.] is a participant of the Life By Design Program. Administrator Folk is the founder and Program Director Of Life By Design. Unit Mgr. LeMasters is her Assistant and Counselor Christmas is the facilitator of Purpose Group for Life By Design. Their rapport with [K.R.] has superseded proper procedure, rules and regulations associated with assessing our incident. Lt. Paliotheodoros and Lt. Grimm had initially assessed the incident being the investigating Lts. that day and issued a [sic] incident report for [K.R.] for 224 assault. On March 22, 2010[,] Counselor Christmas came to the SHU to see [K.R.] (brought her a bible, she is not a prisoner chaplain, nor is [K.R.] on her caseload) and assured her she would be seeing administration concerning her incident report. On March 25, 2010[,] Administrator came to SHU. When she came to my door I asked her when I was getting out. She stated with disdain "Oh you're not, there is going to be an [sic] threat assessment done to determine if the two of you can remain on compound together." I asked her to look at the grapefruit sized bruises on backs of my arms, legs and back. She glanced at them along with Case Mgr. Titchenell and stated that medical assessments would be reviewed during process. However, immediately after leaving my door[,] inmate [K.R.] spoke with Administrator Folk about the possibility of her returning to Life By Design[,] and she told her that due to the violence she could no longer be an active participant, but there is [sic] other things you can remain involved in. On March 28,

2010[,] Unit Mgr. LeMasters pulled myself and [K.R.] out of our cells and escorted us both to SHU hearing room. He stated that one of us was not returning to the compound. He proceeded by asking me what happened. I told him how incident began and ended with [K.R.] beating me with a broom. Then [K.R.] gave her version of the incident. Mr. LeMasters said that he believes that it was a fight and not an assault even if [K.R.] was the aggressor, and that he was having the incident report rewritten. I told Mr. LeMasters that [K.R.] had been housed in SHU and returning with 200 series shot.[6] [K.R.] has been at S.F.F. Hazelton for 18 months. 6 of those months she has spent in SHU for either an assault or attack on me. I had been at SFF-Hazelton since the doors opened and have always been an exceptional inmate. (see exhibit letter for Administrator Folk). I have maintained strong and healthy relationships outside a prison (see exhibits 2, 3, 4). I have remained committed to betterment of self (see Exhibit 5). I have been incarcerated for 16 years and have never received not one incident report. And now incident where I'm clearly not the aggressor I received a disciplinary transfer? The judgment in this incident was unprofessional, unethical and has presented a violation of my 8th amendment rights. Administrator Folk's personal involvement and attachments to the Life By Design Program and its participants has greatly affected her professional abilities and judgments as administrator to provide a safe, secure, and orderly running of this institution."

(Doc. 12-1, pp. 3-5).

On July 18, 2010, Warden Cross denied the remedy, which he noted expressed Plaintiff's opinion that the decision to have her transferred from SFF Hazelton was not conducted in a fair and appropriate manner. Warden Cross determined that the actions by staff were within the scope of policy and Plaintiff's transfer was warranted. (Doc. 12-1, p. 2).

Plaintiff's original appeal to the Regional Office, BP-10, was received on July 30, 2010, and was rejected on August 4, 2010. It is not clear why the remedy was rejected, but Plaintiff resubmitted

---

[6]It appears that Plaintiff may have not completed this sentence.

her BP-10 on August 26, 2010, and the same was closed on August 30, 2010, with directions that she could file an appeal with the Central Office.[7]

On October 21, 2010, Plaintiff signed her Central Office Appeal (BP-11). In it, she stated:

> The BP-10 response relies on the P.S. 5100.08[8] to justify my transfer. However, it does not make mention of the more important issue which arises before any transfer recommendation. The unprofessional, inappropriate conduct by staff is the primary issue. My matter was never viewed by SIS. [In] [a]ny attack by inmate v. inmate, it is standard operational procedure for SIS to be notified and the incident investigated. The mere fact that S.O.P was circumvented is prima facie evidence of gross negligence on the part of the administration at SFF Hazelton. Also, stating that P.S. 5100.08 was applied, I ask how?
> 1) "Institution staff should carefully review the management of cases on an individual basis,[sic]" How was my "individual case" carefully reviewed? Please be specific to my case and how it was carefully reviewed?
> 2) "... applying sound correctional judgment..." please define "sound correctional judgment" is this defined in the P.S. 5100.08? and if so, please cite §# and definition.
> 3). "... that considers the safety and security of the inmate,... which inmate? me [sic] or her, if the answer is "both of you/us" please define @ [sic] of our specific security considerations.
> 4)"... the institution and its staff and the community" please specifically spell out how the review was conducted what exact sound correctional judgment and how they were applied to each principal ie [sic] "the institution," it's [sic] staff"[sic] and "the community".
> I was told that the decision would be based on medical assessment records, prior history and who was the aggressor.{K.M.] was liable in all accounts and still I was the one transferred.
> (Doc. 73-1, pp. 16-17.

Although neither Plaintiff nor the Defendants attached the complete response from the Central Office rejecting the BP-11, the abstract indicates that the purpose of the remedy was requesting

---

[7]Neither Plaintiiff nor Defendants submitted copies of the second BP-10 or the response.

[8]P.S. 5100.08 relates to the subject of "Inmate Security Designation and Custody Classification." This Program Statement is available on the Federal Bureau of Prisons website at bop.gov.

reconsideration of her transfer. As previously noted, one of the purposes of the PLRA's exhaustion requirements is to "afford corrections officials time and opportunity to address complaints internally before allowing the institution of a federal case." Woodford, 548 U.S. at 92-94. Here, although Plaintiff clearly raised concerns about the process by which she was subjected to a disciplinary transfer, she did not raise any allegation that defendants were deliberately indifferent to her safety by allowing K.R. to resume living in the same dorm in which she was residing. Therefore, to the extent Plaintiff seeks compensation from the individual defendants for the injuries she received as the result of the March 21, 2010, fight or assault, she did not raise that issue in her administrative remedies, and that claim should be dismissed.

**Disciplinary Transfer**

In addition to her claim that Defendants failed to protect her from an assault from another inmate, a liberal interpretation of Plaintiff's complaint leads to the conclusion that she is seeking compensation for what she believes was an inappropriate disciplinary transfer. This transfer, at least in part, resulted from a disciplinary proceeding that was conducted following the March 21, 2010, incident.

Prison disciplinary proceedings are not criminal prosecutions and prisoners do not enjoy "the full panoply of due process rights due a defendant in such [criminal] proceedings. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Where, as here, a prison disciplinary hearing may result in the loss of good time credit[9], Wolff holds that due process requires the following:

1. giving the prisoner written notice of the charges at least 24 hours before he appears for his disciplinary hearing;

_____

[9]In fact, the hearing resulted in Plaintiff's loss of 27 days of Good Conduct Time.

2.     providing the prisoner a written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action;

3.     allowing the prisoner to call witnesses and present documentary evidence in his defense, when permitting him to do so will not be an undue hazard to institutional safety or correctional goals;

4.     permitting the prisoner the aid of a fellow prisoner, or if that is forbidden, aid from staff or a competent inmate designated by staff, if the prisoner is illiterate or the complexity of the issue makes it unlikely that the prisoner will be able to collect and present the evidence necessary for an adequate comprehension of the case; and

5.     providing impartial fact finders.

Id. at 564-571. The information before the Court reveals that the petitioner was provided due process as contemplated by Wolff.

First, Plaintiff received written notice of the charges at least 24 hours in advance of the DHO hearing. More particularly, Plaintiff received a copy of Incident Report on April 6, 2010, and the DHO hearing was held on May 14, 2010. (Doc. 80-2, p.12). Second, Plaintiff was provided a written statement by the DHO as to the evidence relied upon to find that she had committed Offense 201, Fighting with Another Person and the reasons for the disciplinary action. The DHO report indicates that the DHO relied on the Incident Report and Investigation as well as Memorandum dated April 6, 2010, and March 21, 2010, from Lt. Paliotheodoros, the Chain of Custody Log, dated March 21, 2010, for the broom, Photo Sheets dated March 21, 2010, for both Plaintiff and K.R. and Clinical Encounters dated March 21, 2010, for both Plaintiff and K.R. With respect to the reasons that sanctions were imposed, the DHO stated that:

The action/behavior on the part of any inmate to become involved in a fight with any other inmate or person, poses a threat to the health, safety, and welfare of not only himself, but all other inmates and staff within the institution and disrupts the orderly running of the institution. In the past, fights between two individuals have expanded to include others which created a larger problem for staff to resolve.

(Docs. 80-2, p. 15)

Third, Plaintiff was advised of her right to call witnesses and present documentary evidence, and in fact, called an inmate as a witness. Fourth, Plaintiff was advised of her right to staff representation and was afforded such representation. Finally, Plaintiff was provided an impartial decision-maker. In accordance with BOP regulations, the DHO did not act as the reporting official, investigating officer, UDC member or witness and did not play a role in referring the charges.[10]

Not only was Plaintiff provided all the due process rights required by Wolff, the findings made by the DHO are sufficient to support the finding that Plaintiff violated Prohibited Act Code 201. The Supreme Court held in Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985) that "[t]he requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." The Supreme Court further stated:

> This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of the witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

In reaching her decision, the DHO considered the reporting officer's statements contained in the Incident Report and Plaintiff's admission that she did bite K.R.. After considering all of the evidence the DHO found that Plaintiff had violated Code 201. So long as there is evidence to support the DHO's determination, it must stand. See Superintendent at 455-56. Here, the testimony and documents considered by the DHO clearly provided "some evidence" from which a rational conclusion could be drawn that Plaintiff committed the act as charged. Therefore, Plaintiff has failed to demonstrate that her due process rights were denied.

---

[10]See 28 C.F.R. § 541.16(b).

Finally, to the extent Plaintiff alleges that her transfer entitles her to monetary relief, "[a]n inmate has no justifiable expectation that [s]he will be incarcerated in any particular prison." Olin v. Waukinekoma, 461 U.S. 238 (1983). Accordingly, the plaintiff had no protected interest in designation to SFF Hazelton or any other particular institution and any claim for relief as the result of her transfer must be dismissed for failure to state a claim.

## IV.   Recommendation

For the foregoing reasons, the undersigned hereby recommends that Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment (Doc. 79) be **GRANTED** and the Plaintiff's FTCA complaint (Doc. 73) be **DISMISSED with prejudice**. It is further recommended that Plaintiff's Bivens complaint (Doc. 12) be **DISMISSED with prejudice**. In the event the Court declines to dismiss the FTCA, the undersigned recommends that Plaintiff's Bivens complaint, as it relates to her claim for failure to protect be **DISMISSED without prejudice** for failure to exhaust administrative remedies and with respect to her claim regarding a disciplinary transfer, be **DISMISSED with prejudice** for failure to state a claim upon which relief can be granted.

Within fourteen (14) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections.  A copy of any objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation.   28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208.

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to her last known address as shown on the docket, and to counsel of record via electronic means.

DATED: January 21, 2015

*/s Robert W. Trumble*

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE